**REVISED**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-10892
_____


LULIRAMA LTD, INC; SPENCER MICHLIN,

                    Plaintiffs-Counter Defendants-
                    Appellants-Cross-Appellees,

v.

AXCESS BROADCAST SERVICES, INC,

                    Defendant-Counter Claimant-
                    Appellee-Cross-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Texas
_____
November 10, 1997

Before POLITZ, Chief Judge, KING, Circuit Judge, and DUPLANTIER,[*]
District Judge.

KING, Circuit Judge:

     Plaintiffs-Appellants Lulirama Ltd., Inc. and Spencer
Michlin appeal the district court's denial of their motion for
summary judgment and partial grant of the summary judgment motion
filed by Defendant-Appellee Axcess Broadcast Services, Inc.
Axcess appeals the district court's refusal to impose sanctions
on Lulirama and Michlin pursuant to Rule 11 of the Federal Rules

_____

     [*] District Judge of the Eastern District of Louisiana,
sitting by designation.

of Civil Procedure. We affirm in part and vacate and render in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In November 1991, Lulirama Ltd., Inc. ("Lulirama") and Axcess Broadcasting Services, Inc. ("Axcess") entered into a one-year business arrangement (the "Jingle Writing Agreement") in which Lulirama's president Spencer Michlin, through Lulirama, was to write and provide Axcess with fifty advertising jingles at a rate of $750 per jingle, for a total of $37,500. One third of the price was to be paid up front, with the remainder paid in four installments. Michlin's services were to be provided on a confidential basis, and he was not to provide similar services to any company selling musical advertising through radio and television stations during the time period covered by the agreement. The Jingle Writing Agreement is memorialized in a one-page billing statement signed by both parties. The statement contains handwritten notations added by Axcess which specify that the work is "for hire," that the jingles are to be delivered at a rate of thirteen per quarter, and that they must be approved by Otis Conner, the president of Axcess. Axcess timely paid Lulirama under this agreement, but Lulirama provided only seven jingles.

In April 1992, Lulirama, Michlin, and Axcess entered a written license agreement (the "Promotional License Agreement") that gave Axcess the right to use any musical works in which Lulirama or Michlin could "claim ownership or other right, title

2

or interest, whatsoever" for demonstration and promotional purposes at client meetings for product development. In return, Axcess was to pay Lulirama $1,000 per month for the first two years and $1,500 per month thereafter. The term of the Promotional License Agreement was one year, but it was automatically renewable for up to four years at the discretion of Axcess.

In March 1993, the parties orally extended the Jingle Writing Agreement for an indefinite period of time. Axcess was to pay Lulirama $50,000 per year in monthly installments of $4,166, based on a rate of $1,000 per jingle. The parties terminated the Jingle Writing Agreement as extended in June 1994.

From March 1993 to June 1994, Axcess paid Lulirama approximately $66,658 in monthly installments of $4,166, but Lulirama provided only twenty-nine songs. Axcess subsequently sought to have some of the money it had paid to Lulirama refunded, or, in the alternative, to have Lulirama provide it with the jingles that Axcess claimed it was due under the Jingle Writing Agreement.

Axcess sued Lulirama and Michlin in Texas state court in December 1994. The state district court granted summary judgment in favor of Axcess on a breach of contract theory and ordered Lulirama to refund some of its money to Axcess based on Lulirama's failure to provide songs due under the Jingle Writing Agreement. See Axcess Broadcast Servs. v. Michlin, No. 94-12703 (192d Dist. Ct., Dallas County, Tex. June 9, 1995). Lulirama

appealed, and the Dallas court of appeals reversed the state district court's entry of summary judgment while the federal case was pending before this court. See Lulirama Ltd. v. Axcess Broadcast Servs., No. 05-95-01212-CV, 1996 WL 743774 (Tex. App.-- Dallas Dec. 31, 1996).

On October 31, 1995, Lulirama and Michlin[2] filed suit against Axcess in federal district court, asserting thirty-six claims of copyright infringement. Lulirama alleged that, without proper authorization, Axcess reproduced the jingles, prepared derivative jingles, distributed copies of the jingles, and authorized others to perform the jingles in violation of Lulirama's copyrights. Axcess answered, asserting several affirmative defenses and alleging that it owned the copyrights to all of the jingles. Axcess also filed a counterclaim asserting a fraud claim and a claim for declaratory judgment that Axcess owned the copyrights to all of the jingles or, in the alternative, that it had "a continuing, unqualified license for the unlimited use" of the jingles.

Axcess filed a motion for summary judgment, and Lulirama filed a motion for partial summary judgment. Axcess also filed a motion for Rule 11 sanctions on the grounds that Lulirama's

---

[2] Lulirama and Michlin concede that any copyrights that Michlin would otherwise own as creator of the jingles are owned by Lulirama pursuant to the work for hire doctrine because Michlin wrote the jingles in the course and scope of his employment as president of Lulirama. See 17 U.S.C. § 101, 201. Because Michlin has no claim to any of the copyrights at issue in this case, the remainder of this opinion refers only to Lulirama in discussing the legal positions of Lulirama and Michlin.

complaint lacked a legal basis and was filed for improper purposes. The court granted in part and denied in part Axcess's motion, dismissed its fraud claim, and denied Lulirama's motion for partial summary judgment. Specifically, the district court held that Lulirama's copyright infringement claims were barred by res judicata,[3] that Axcess owned the copyrights in the first seven jingles, and that Lulirama owned the copyrights in the subsequent twenty-nine jingles. The district court held, however, that Axcess had an oral or implied license to use the twenty-nine songs[4] and that Axcess had not exceeded the scope of the license.[5] The district court also denied Axcess's motion for

---

[3] Following the district court's entry of final judgment in this case, the Dallas Court of Appeals reversed the state district court's judgment rendering summary judgment in favor of Axcess. Accordingly, Lulirama's copyright infringement claims cannot be precluded by res judicata. See Savidge v. Fincannon, 836 F.2d 898, 906 (5th Cir. 1988) ("A decree that has been vacated or nullified by an appellate court cannot be given res judicata effect."); 18 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4432, 302 (1981) ("Reversal and remand for further proceedings on the entire case defeats preclusion entirely until a new final judgment is entered by the trial court or the initial judgment is restored by further appellate proceedings. The fact that an appeal is pending in a higher appellate court does not restore the preclusive effects of the reversed judgment.").

[4] The district court did not specify whether it construed the license to be exclusive or nonexclusive. However, as explained in Part II.A.2.b, infra, the license is necessarily nonexclusive because it is not reflected in a written instrument.

[5] This holding is not reflected in the district court's final judgment even though Axcess requested declaratory judgment to this effect as an alternative to a declaratory judgment that it owned the copyrights to all thirty-six jingles. Presumably, the district court intended its holding that Axcess had a license to use the last twenty-nine jingles as an alternative basis for the court's disposition of Lulirama's copyright infringement claims.

Rule 11 sanctions. Lulirama timely appealed and Axcess cross-appealed.

## II. DISCUSSION

Lulirama challenges the district court's conclusions (1) that Axcess owns the copyrights to the seven jingles that Lulirama provided to Axcess during the first year of the Jingle Writing Agreement and (2) that Axcess has an implied or oral license to use the twenty-nine jingles that Lulirama provided to Axcess after the first year of the Jingle Writing Agreement. Axcess appeals the district court's denial of its motion for Rule 11 sanctions against Lulirama for filing a meritless lawsuit for improper purposes. We address each of these issues in turn.

### A. Summary Judgment

#### 1. Standard of Review

"We review a grant of summary judgment de novo, applying the same criteria used by the district court in the first instance." Texas Manufactured Housing Ass'n v. City of Nederland, 101 F.3d 1095, 1099 (5th Cir. 1996), cert. denied, 117 S. Ct. 2497 (1997). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

6

2.  Analysis

a.  Copyright ownership of the first seven jingles

The district court concluded that Axcess owned the copyrights to the first seven jingles that Lulirama produced under the Jingle Writing Agreement on the ground that these jingles were works for hire within the meaning of the Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541 (1976) (codified as amended in scattered sections of 17 U.S.C.).

Under the Copyright Act, copyright ownership "vests initially in the author or authors of the work."  17 U.S.C. § 201(a).  "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection."  Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989).  However, the Act creates an exception to this general rule that authorship vests in the creator for "works made for hire."  See 17 U.S.C. § 201(b).  Section 201(b) of the Act provides:

> In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

Id.  Section 101 defines a "work made for hire" as follows:

(1)  a work prepared by an employee within the scope of his or her employment; or

(2)  a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a

7

> compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

Id. § 101. The two parts of this working definition are mutually exclusive: the first part applies to works created by employees; the second applies to works created by independent contractors. See Reid, 490 U.S. at 742-43. The district court concluded that Lulirama acted as an independent contractor for Axcess in providing the jingles pursuant to the Jingle Writing Agreement, and none of the parties dispute this conclusion.

The district court determined that the jingles written pursuant to the Jingle Writing Agreement during the first year of the agreement fit the second prong of the Copyright Act's definition of "works made for hire." In reaching this conclusion, the court relied on an affidavit that Michlin executed in conjunction with Axcess's state court action in which Michlin expressed the following understanding of the Jingle Writing Agreement:

> Under this arrangement, I was to supply Axcess' requirements for advertising jingles and provide them to Axcess through my company Lulirama. Axcess was to sell these songs to its television and radio station clients.

The district court concluded that the above statement indicated that the jingles written pursuant to the first year of the Jingle Writing Agreement were "works specially ordered or commissioned for use . . . as a part of a motion picture or other audiovisual work," 17 U.S.C. § 101, based on the following rationale:

> It is best to interpret the broad term "audiovisual" to include both purely visual and purely audio works as well as combined audio and visual works. No purpose of the Copyright Act would be served by a narrower definition because there is nothing inherent, from a copyright policy perspective, in a purely visual, purely audio, or combination work to merit differential treatment.

Lulirama contends that the district court improperly expanded the class of specially commissioned works that can be works for hire within the meaning of the Copyright Act. We agree.[6]

The Supreme Court observed in Reid that the legislative history of the Copyright Act of 1976 indicates that it is "a carefully worked out compromise aimed at balancing legitimate interests" of hiring parties and artists. Reid, 490 U.S. at 748 (internal quotation marks omitted). As such, the Court admonished that "[s]trict adherence to the language and structure of the Act is particularly appropriate." Id. at 748 n.14.

A work created by an independent contractor can constitute a work for hire only if it fits one of the nine narrowly drawn

---

[6] Lulirama also argues somewhat cursorily that the billing statement memorializing the first year of the Jingle Writing Agreement described the jingles in question insufficiently to establish a valid work for hire agreement. We need not resolve this issue because we conclude that the district court erred in holding as a matter of law that Axcess owns the copyrights to the first seven jingles. As explained in Part II.A.2.b, infra, Axcess has requested in the alternative declaratory judgments that it either owns the copyrights to these jingles or has an unlimited license to use them. Because we conclude as a matter of law that Axcess has, at a minimum, a nonexclusive license to use the jingles as it has, remand for determination of copyright ownership is unnecessary. Accordingly, we need not determine whether Axcess's claim to copyright ownership with respect to the first seven jingles is foreclosed as a matter of law on the alternative ground advanced by Lulirama.

categories of works delineated in the second part of § 101's definition of "works made for hire."  See id. at 748 ("[T]he legislative history underscores the clear import of the statutory language:  only enumerated categories of commissioned works may be accorded work for hire status."); Easter Seal Soc'y for Crippled Children and Adults v. Playboy Enters., 815 F.2d 323, 328 n.8 (5th Cir. 1987) ("Only the buyers and sellers of works falling with[in] § 101(2)'s nine categories can decide who will be the statutory author; and then only by compliance with the statute of frauds clause.").  Axcess contends only that the jingles fit one of the categories listed in § 101:  the category of "work[s] specially ordered or commissioned for use . . . as a part of a motion picture or other audiovisual work."  17 U.S.C. § 101.  Accordingly, this is the only potential avenue to work for hire status that we address.

> Section 101 of the Act defines "audiovisual works" as
>
>> works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

17 U.S.C. § 101.  The plain language of this definition indicates that an audiovisual work must have a visual component.  In order to be classified as an audiovisual work, the work in question "must consist of (1) 'images;' (2) such images must be 'related' and presented in a 'series;' (3) such images must be capable of being shown by a machine or device."  1 MELVILLE B. NIMMER & DAVID

10

NIMMER, NIMMER ON COPYRIGHT § 2.09[A] (1997) [hereinafter NIMMER] (footnotes omitted).  Use of the term "images" in the statutory definition denotes a visual component because the definition indicates that an audiovisual work consists of "images . . . together with accompanying sounds, if any."  17 U.S.C. § 101 (emphasis added).  To conclude that an "image" within the Act's definition of "audiovisual works" need not contain a visual component would render the reference to "accompanying sounds" in the definition superfluous because "accompanying sounds" would be subsumed by the term "images."  Such a statutory construction would violate the long-settled principle that each word in a statutory scheme must be given meaning.  See Bailey v. United States, 116 S. Ct. 501, 506 (1995) (noting the "assumption that Congress intended each of its terms [in a statutory scheme] to have meaning").

Moreover, § 102 of the Act lists "motion pictures and other audiovisual works" and "sound recordings" as distinct categories of works entitled to copyright protection.  See 17 U.S.C. § 102. That Congress chose to create these separate categories indicates that it recognized a distinction between audiovisual and purely audio works.  Additionally, Section 101 defines "sound recordings" as

> works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied.

11

Id. § 101 (emphasis added).  The district court's conclusion that "purely audio works" constitute "audiovisual works" would render the category of "sound recordings" completely empty.  Because works otherwise meeting the definition of "sound recordings" are purely audio works, under the district court's statutory construction, they would all be excluded from the definition because they would also constitute "other audiovisual work." Therefore, we cannot agree with the district court that the term "audiovisual works" encompasses "purely audio works."

Axcess argues that Michlin's statement that he agreed to provide advertising jingles to Axcess "to sell . . . to its television and radio station clients" indicates that each of the jingles was commissioned for use in both the television and radio mediums.  Axcess argues that, to the extent that each jingle was commissioned for use in television, each jingle is "a work specially ordered or commissioned for use . . . as a part of a motion picture or other audiovisual work."  17 U.S.C. § 101. However, Michlin's statement of his understanding of the Jingle Writing Agreement does not unambiguously indicate that each jingle that he wrote pursuant to the Jingle Writing Agreement would potentially be used both for television and radio advertising.  One could read his statement as indicating that Axcess intended to commission some jingles for use in television advertisements and other jingles for use in radio advertisements. Because the summary judgment evidence does not indicate which of the first seven jingles were commissioned for use as part of a

12

television advertisement, a radio advertisement, or both, a genuine issue of material fact exists as to whether any or all of these jingles were "specially ordered or commissioned for use . . . as a part of a motion picture or other audiovisual work," 17 U.S.C. § 101, and thus whether they are works made for hire.[7]

Axcess argues in the alternative, however, that it has a nonexclusive license to use the first seven jingles, as well as the twenty-nine jingles produced during the period in which the parties extended the Jingle Writing Agreement without a written embodiment of the agreement. We turn now to the issue of nonexclusive license.

### b.  Nonexclusive license

The district court concluded that no valid work for hire agreement existed with respect to the twenty-nine jingles written after the original Jingle Writing Agreement expired at the end of one year because the extension of the Jingle Writing Agreement was not evidenced in a writing signed by the parties. Accordingly, the court determined that Lulirama, as the employer of the creator of these works, owned the copyrights to them.

---

[7]  Axcess insists that a particular jingle need not have been commissioned only for use in an audiovisual work in order to qualify for work for hire status.  Assuming that this is true, it is clear that, in order for a particular jingle to qualify as a work for hire, Axcess must have commissioned it at least in part for the purpose of making it a part of an audiovisual work. The summary judgment evidence in this case does not establish that at least part of the purpose for Axcess's commissioning each of the first seven jingles was for use in television advertising. Accordingly, summary judgment in favor of Axcess as to its ownership of the copyrights to the first seven jingles was inappropriate.

13

Axcess does not dispute this conclusion.  The district court went on to conclude that, while Lulirama owned the copyrights to these jingles, it had granted Axcess an oral or implied license to sell the jingles to Axcess's radio and television customers.  Lulirama contends that the district court erred in this regard.  We cannot agree.

While the Copyright Act requires that exclusive licenses be evidenced by a writing, no such writing requirement applies to nonexclusive licenses.  Section 204(a) of the Act provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).  Section 101 of the Act defines "transfer of copyright ownership" to include exclusive licenses, but expressly excludes nonexclusive licenses.  See id. § 101.  As such, "[u]nder federal law, a nonexclusive license may be granted orally, or may even be implied from conduct."  3 NIMMER, supra, § 10.03[A], at 10-40 (footnotes omitted); see also I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996); Effects Assocs. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990).

"When the totality of the parties' conduct indicates an intent to grant such permission, the result is a legal nonexclusive license . . . ."  3 NIMMER, supra, § 10.03[A], at 10-41 (footnotes omitted).  Other circuits have held that an implied nonexclusive license arises when "(1) a person (the licensee)

14

requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." I.A.E., 74 F.3d at 776 (citing Effects, 908 F.2d at 558-59).

In this case, the above criteria are plainly satisfied. First, Axcess requested the creation of the jingles. Second, Michlin created the jingles as Lulirama's agent and Lulirama delivered them to Axcess. Third, Michlin conceded in his affidavit that he understood that, pursuant to the Jingle Writing Agreement, Axcess would sell the jingles to its radio and television customers. Lulirama nevertheless advances a number of arguments as to why a nonexclusive license did not arise in this case, all of which we find to be without merit.

Lulirama first argues that a nonexclusive license cannot exist between the parties because the parties intended that Axcess would obtain full copyright ownership of the jingles pursuant to the work for hire doctrine. The Eleventh Circuit rejected a similar argument in Jacob Maxwell, Inc. v. Veeck, 110 F.3d 749 (11th Cir. 1997). In that case, an artist agreed to write a song for a baseball team, and the parties agreed orally that the baseball team would have an exclusive license to use the song. See id. at 751. Applying Florida contract law, the court concluded that, although no exclusive license existed because such a license cannot be created orally, the artist had granted the baseball team a nonexclusive license to use the jingle

15

because it had acquiesced in the team's use of the song. See id. at 752. In so doing, the court rejected the argument that the parties' intention to create an exclusive license foreclosed the recognition of a nonexclusive license. See id. at 752-53. The court observed:

> Like the district court, we conclude that while it may well be that the parties in their initial negotiations contemplated an exclusive license, JMI cannot reasonably deny, given its subsequent conduct here, that it granted to the Miracle the sort of lesser, nonexclusive license to play the piece during the summer of 1993 that federal law recognizes may result from a purely oral transaction.

Id. at 753.

We agree with the analysis of the Eleventh Circuit. Under Texas contract law,[8] illegal contracts are generally unenforceable. See Plumlee v. Paddock, 832 S.W.2d 757, 759 (Tex. App.--Fort Worth 1992, writ denied). However, a court will sever the illegal portion of the agreement and enforce the remainder if the parties would have entered the agreement absent the illegal portion of the original bargain. See Panasonic Co. v. Zinn, 903 F.2d 1039, 1041 (5th Cir. 1990).

> Where the subject matter of the contract is legal, but the contract contains an illegal provision that is not an essential feature of the agreement, the illegal provision may be severed and the valid portion of the contract enforced. . . . In determining whether a particular provision is severable, "the issue is whether [the parties] would have entered into the agreement absent the illegal parts."

---

[8] To the extent that it is not inconsistent with the Copyright Act and its policies, Texas law governs our analysis of whether the parties contractually created a nonexclusive license. See Fantastic Fakes, Inc. v. Pickwick Int'l, Inc., 661 F.2d 479, 482-83 (5th Cir. Unit B Nov. 1981).

16

<u>Id.</u> (quoting <u>Rogers v. Wolfson</u>, 763 S.W.2d 922, 925 (Tex. App.--Dallas 1989, writ denied); <u>see also</u> <u>Redgrave v. Wilkinson</u>, 208 S.W.2d 150, 152 (Tex. Civ. App.--Waco 1948, writ ref'd n.r.e.) ("If, for a legal consideration, a party undertakes to do two or more acts, and a part of them are unlawful, the contract is good for so much as is lawful, and void for the residue. Whenever the unlawful part of a contract can be separated from the rest, it will be rejected and the remainder established." (internal quotation marks omitted)); 6A ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1522, at 760-61 (1962) (noting the well-recognized rule that, "if a lawful consideration is given for two promises, one of which is lawful and the other unlawful, the lawful promise is enforceable" and observing that "there is no injustice to the defendant in permitting the plaintiff to abandon the illegal promise and to enforce the other one . . . [because] [t]he defendant receives everything for which he bargained and gives less in return").

Lulirama states in its response brief that "[t]he record here indicates that a work for hire agreement was presumably intended," and that "Michlin mistakenly believed that a valid work for hire agreement had been reached." It would be quite anomalous to allow Lulirama, which admittedly intended by the Jingle Writing Agreement to convey to Axcess a bundle of rights including all of the exclusive rights of copyright ownership, to complain that the intent of the parties to the agreement was frustrated by the district court's conclusion that Lulirama

17

conveyed by implication a smaller bundle of rights. Because Lulirama intended to convey to Axcess all of the rights associated with ownership of the copyrights to the jingles, it of necessity intended to convey the lesser-included set of rights associated with a nonexclusive license to use the jingles.

Lulirama also argues that the existence of the Promotional License Agreement between Lulirama and Axcess, which provided Axcess with an exclusive license to use all works to which Lulirama could claim an ownership interest for promotional purposes, forecloses our finding an implied or oral nonexclusive license. In support of this contention, Lulirama directs us to Woodard v. Southwest States, Inc., 384 S.W.2d 674 (Tex. 1964). In that case, the Texas Supreme Court held that, "[w]here there exists a valid express contract covering the subject matter, there can be no implied contract." Id. at 675.

The flaw in Lulirama's argument stems from the fact that no express, written contract exists covering the subject matter of the nonexclusive license in this case. The owner of a copyright is free to grant multiple licenses for different uses of the same material. Buffalo Broad. Co., Inc. v. American Soc'y of Composers, Authors and Publishers, 744 F.2d 917, 920 (2d Cir. 1984) ("The [Copyright] Act specifically accords the copyright owner the right to authorize others to use the various rights recognized by the Act, including the performing right and the reproduction right and to convey these rights separately." (citations omitted)). The Promotional License Agreement provided

18

Axcess with the very limited right to use all works in which Lulirama could claim an ownership interest for promotional purposes. The Jingle Writing Agreement provided Axcess with the right to sell and distribute the jingles created pursuant to the agreement. To the extent that the agreements involve distinct rights, the nonexclusive license that the district court determined to exist does not cover the same subject matter as the Promotional License Agreement.

This conclusion finds further support in the fact that it is highly questionable whether the jingles delivered pursuant to the Jingle Writing Agreement are even subject to the Promotional License Agreement. Lulirama concedes in its response brief that "[t]he record here indicates that a work for hire agreement was presumably intended. Such an agreement, if it were valid, would have vested original copyright ownership in Axcess." This statement makes clear that, at the time the parties entered the Promotional License Agreement, they did not believe that the jingles created pursuant to the Jingle Writing Agreement would be covered by it because they believed that Axcess would possess the copyrights to the jingles pursuant to the work for hire doctrine. As such, neither of the parties conceived of the jingles created pursuant to the Jingle Writing Agreement as musical works in which Lulirama or Michlin could "claim ownership or other right, title or interest, whatsoever" for purposes of the Promotional License Agreement. Lulirama adamantly argues that, in interpreting contracts, courts must "take the wording of the

19

contract in the light of the surrounding circumstances," <u>Watkins v. Petro-Search, Inc.</u>, 689 F.2d 537, 538 (5th Cir. 1982), so as to "carry out the intentions of the parties as of the time the instrument was executed." <u>First Nat'l Bank v. Kinabrew</u>, 589 S.W.2d 137, 138 (Tex. Civ. App.--Tyler 1979, writ ref'd n.r.e.). Applying these precepts to the Promotional License Agreement, we are skeptical that the agreement even covers the same works as the Jingle Writing Agreement, much less the same rights to those works.

Moreover, acceptance of Lulirama's position that the existence of the Promotional License Agreement precludes a finding that Axcess obtained additional rights to the jingles through an implied license would require acceptance of the absurd premise that the Jingle Writing Agreement and its oral extension, pursuant to which Axcess paid Lulirama more than one hundred thousand dollars from 1991 to 1994, provided Axcess with no more rights to the jingles than it obtained through the Promotional License Agreement, pursuant to which Axcess paid Lulirama an additional $1000 (and later $1500) per month. We decline to accept this premise, and therefore conclude that the existence of the Promotional License Agreement in no way precludes the existence of an oral or implied license.

Lulirama next argues that finding an oral or implied license in this case would circumvent the statutory embodiment of the work for hire doctrine by allowing Axcess to obtain the benefits of noncreator authorship without complying with the statutory

20

requisites for such status.  This is simply not true.  As a result of the Jingle Writing Agreement, Axcess obtained a <u>nonexclusive</u> license to use the jingles created pursuant to the agreement.  If Axcess had acquired the copyrights to the jingles as a result of the agreement, it would have obtained the <u>exclusive</u> right to, among other things, (1) reproduce and make copies of the jingles; (2) prepare derivative works based on the jingles; (3) distribute copies or phonorecords of the jingles to the public by sale or other transfer of ownership, or by rental, lease or lending; and (4) authorize others to perform the jingles publicly.  <u>See</u> 17 U.S.C. § 106.  However, because neither the original Jingle Writing Agreement nor its oral extension constituted a valid work for hire agreement, Axcess could not obtain ownership of the copyrights to the jingles via the Jingle Writing Agreement.  As such, it obtained only a nonexclusive right to engage in the above activities.  This conclusion in no way circumvents the Copyright Act.

Lulirama next argues that, even if the Jingle Writing Agreement and its oral extension created a nonexclusive license, a fact issue exists as to whether Axcess's use of the jingles overstepped the boundaries of the implied license.  This argument lacks merit.  In conceding that the parties intended by the Jingle Writing Agreement to vest Axcess with original copyright ownership to the jingles, Lulirama concedes that the parties intended to grant Axcess the right to take any action consistent with copyright ownership.  This would include all of the actions

21

that form the basis of Lulirama's claims of copyright infringement, i.e., (1) reproducing and making copies of the jingles; (2) preparing derivative works based on the jingles; (3) distributing copies or phonorecords of the jingles to the public by sale or other transfer of ownership, or by rental, lease or lending; and (4) authorizing others to perform the jingles publicly. See 17 U.S.C. § 106. Therefore, Axcess has not overstepped the bounds of its nonexclusive license.

Lulirama finally argues that, even if the Jingle Writing Agreement created a nonexclusive license, Lulirama revoked the nonexclusive license by filing this lawsuit. This argument also lacks merit. A nonexclusive license may be irrevocable if supported by consideration. See 3 NIMMER, supra, § 10.02[B][5] ("[N]onexclusive licenses are revocable absent consideration."); Avtec Sys., Inc. v. Peiffer, 21 F.3d 568, 574 n.12 (4th Cir. 1994); Keane Dealer Servs., Inc. v. Harts, 968 F. Supp. 944, 947 (S.D.N.Y. 1997); Johnson v. Jones, 885 F. Supp. 1008, 1013 n.6 (E.D. Mich. 1995). This is so because a nonexclusive license supported by consideration is a contract. See Jacob Maxwell, 110 F.3d at 752-53 (construing an implied nonexclusive license supported by consideration as an implied contract); I.A.E., 74 F.3d at 776 ("[I]mplied licenses are like implied contracts . . . . ."); Effects, 908 F.2d at 559 n.7 (noting that an implied license is "a creature of law much like any other implied-in-fact contract"); 3 NIMMER, supra, § 10.01[C][5] & n.73.1 (observing that a license can be a form of contract in the sense that it is,

22

"in legal contemplation, merely an agreement not to sue the licensee for infringement.").

Lulirama's argument that it revoked any implied license that might have arisen by filing the present lawsuit is tantamount to an argument that it had a unilateral right of rescission without notice--an argument entirely inconsistent with the existence of a contract between the parties. If Lulirama had the ability to terminate the license at will, then no contract could exist because Lulirama's obligation under the contract would be illusory. See RESTATEMENT (SECOND) OF CONTRACTS § 2 cmt. e (1981) ("Words of promise which by their terms make performance entirely optional with the 'promisor' whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise. Although such words are often referred to as forming an illusory promise, they do not fall within the present definition of promise."); Light v. Centel Cellular Co., 883 S.W.2d 642, 645 (Tex. 1994) ("When illusory promises are all that support a purported bilateral contract, there is no contract."). A presumption exists that parties to a purported contract did not intend to make illusory promises. See Holquin v. Twin Cities Servs., Inc., 750 S.W.2d 817, 819 (Tex. App.--El Paso 1988, no writ) ("[I]t is presumed that when parties make an agreement they intend it to be effectual, not nugatory; and the contract will be construed in favor of mutuality . . . .").

The record in this case provides no indication that the parties intended that Axcess's right to use the jingles was

23

terminable at the will of Lulirama.  Accordingly, we conclude that Axcess's rights under the nonexclusive license created by the Jingle Writing Agreement did not end upon Lulirama's filing the present lawsuit.[9]

In sum, we conclude that the district court correctly determined that Axcess has a nonexclusive license to use the last twenty-nine jingles created pursuant to the Jingle Writing Agreement.  As we noted in Part II.A.2.a, supra, a triable issue of fact may exist as to whether Axcess owns the copyrights to the first seven jingles created pursuant to the work for hire doctrine.  However, in its counterclaim, Axcess sought declaratory judgment that it either (1) owned the copyrights to these jingles or (2) had a license to use them.  It sought summary judgment on its declaratory judgment claim, thus indicating that it wished to have summary judgment declaring either that it owns the copyrights to the jingles or that it has a license to use them.

Based on the same analysis applied to the last twenty-nine jingles, we conclude as a matter of law that, at a minimum,

---

[9]  Lulirama also contends that summary judgment was improper because the district court stayed discovery and therefore denied Lulirama the opportunity to discover evidence that would create fact issues as to its copyright infringement claims.  However, Lulirama provides no indication of what evidence it hoped to find had the district court allowed it to continue with discovery. Accordingly, we find this argument to be without merit.  Daboub v. Gibbons, 42 F.3d 285, 288 (5th Cir. 1995) ("[T]he [plaintiffs'] silence as far as naming what they are looking for through discovery is fatal to their argument [that the district court denied them sufficient discovery], and the district court's decision to rule on the summary judgment motion was proper.").

24

Axcess has a nonexclusive license to use the first seven jingles created pursuant to the Jingle Writing Agreement. Put another way, as a matter of law, Lulirama cannot state a claim of copyright infringement against Axcess based upon Axcess's past or future use of the first seven jingles. See NIMMER, supra, § 10.01[C][5] n.73.1 ("A license is, in legal contemplation, merely an agreement not to sue the licensee for infringement."). This conclusion should not be construed as disposing of the issue of who actually owns the copyrights to the first seven jingles. None of the claims presented by the parties mandates resolution of this issue. Lulirama's copyright infringement claims are foreclosed regardless of who owns the copyrights, and Axcess has requested alternative declarations of its rights with respect to these jingles that obviate the need for a determination of copyright ownership.

## B. Sanctions

Axcess contends that the district court committed reversible error in denying its motion for sanctions against Lulirama pursuant to Rule 11 of the Federal Rules of Civil Procedure. We disagree.

Rule 11 imposes the following duties on parties making representations to a federal court:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,--

25

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

FED. R. CIV. P. 11. The rule provides that, if the court determines that an attorney has violated the above provisions, "the court may . . . impose an appropriate sanction upon the attorneys, law firms, or parties that have violated [the above provisions] or are responsible for the violation."  Id. (emphasis added).

"We review all aspects of a district court's decision to invoke Rule 11 and accompanying sanctions under an abuse of discretion standard."  Childs v. State Farm Mut. Auto. Ins. Co., 29 F.3d 1018, 1023 (5th Cir. 1994).  This standard is necessarily deferential because, based on its "[f]amiliar[ity] with the issues and litigants, the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard mandated by Rule 11." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 402 (1990).

26

Axcess contends that the district court abused its discretion in declining to impose Rule 11 sanctions for two reasons:  (1) because the record contains no evidence indicating that Lulirama did not authorize Axcess's use of the jingles, and (2) because Axcess took inconsistent legal positions in the state and federal court actions as to the legal effect of the Promotional License Agreement.  We reject both of these contentions.

As to the first, a prima facie claim of copyright infringement requires proof of two elements:  "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).  The existence of a license authorizing use of copyrighted material is an affirmative defense, and Axcess therefore bears the burden of proving the existence of a license.  See CMS Software Design Sys., Inc. v. Info Designs, Inc., 785 F.2d 1246, 1248 (5th Cir. 1986).  Thus, the absence of evidence in the record indicating that Lulirama did not authorize Axcess's use of the jingles does not indicate that Lulirama's claims of copyright infringement lack any basis in law or fact because establishing the absence of a license is not an element of proof required to state a prima facie claim of copyright infringement.

As to Axcess's second argument, the district court concluded that the doctrine of judicial estoppel was a sufficient deterrent to Lulirama's taking inconsistent legal positions.  In light of

27

its unique "[f]amiliar[ity] with the issues and litigants," we cannot say that the district court abused its discretion in making this determination.  Cooter & Gell, 496 U.S. at 402; see also Ergo Science, Inc. v. Martin, 73 F.3d 595, 598 (5th Cir. 1996) ("The doctrine of judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.").

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM those portions of the district court's judgment (1) dismissing Lulirama's copyright infringement claims with prejudice and (2) declaring that Lulirama owns the copyrights to the last twenty-nine jingles created pursuant to the Jingle Writing Agreement.  We VACATE that portion of the district court's judgment declaring that Axcess owns the copyrights to the first seven jingles and RENDER declaratory judgment that Axcess has a nonexclusive license to reproduce these jingles, create derivative works from them, distribute and sell them to its radio and television customers, and authorize public performances of them.  We AFFIRM the district court's order denying sanctions against Lulirama.  Costs shall be borne by Lulirama.