Richard WARREN, Triplet Music Enterprises, Inc., Mini–Persons, Inc., and Forerunner Industries, Inc. Plaintiff,

v.

FOX FAMILY WORLDWIDE, INC., Princess Cruises Lines, Ltd., the Christian Broadcasting Network, Inc., MTM Productions and Does 1 through 10, inclusive Defendants.

No. 01CV4667 MMM (AJWx).

United States District Court,
C.D. California.

Oct. 15, 2001.

Leonard J. Comden, Alan I. Cyrlin, Wasserman Comden & Casselman, Tarzana, CA, for Richard Warren, Triplet Music Enterprises Inc., Mini-Persons Inc., Forerunner Industries Inc.

Richard Warren, Calabasas, CA, Pro se.

Daniel M. Petrocelli, Robert C. Welsh, Drew Breuder, O'Melveny & Myers, Los Angeles, CA, for Fox Family Worldwide Inc., Princess Cruises, Christian Broadcast Network, Inc.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

MORROW, District Judge.

In his first amended complaint, plaintiff Richard Warren[1] alleges that defendants Fox Family Worldwide ("Fox"), MTM Productions, the Christian Broadcasting Network ("CBN") and Princess Cruises have infringed copyrights in music he composed for the television series "Remington Steele." Warren asserts that he is the beneficial owner of the copyrights, which Fox, MTM and CBN have infringed either by selling broadcast rights to, or broadcasting, episodes of the series without accounting for and paying royalties to him. Warren similarly contends that Princess Cruises infringed the copyrights by broadcasting episodes of the series on close-circuit television in 1998 and 1999. In addition to a claim for copyright infringement and a request that the copyrights be assigned irrevocably to him, Warren pleads state law claims for breach of contract, fraud, conversion, unjust enrichment, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, unfair competition, and an accounting.

On September 13, 2001, Fox and CBN filed a motion to dismiss Warren's amended complaint. Citing Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, they assert that the court lacks subject matter jurisdiction and that the complaint fails to state a claim upon which relief can be granted. Specifically, Fox and CBN argue that Warren is neither the legal nor the beneficial owner of the copyrights in question, and thus that he lacks standing to sue. They further assert that he cannot sue under the Copyright Act because he failed to register a copyright in the relevant musical compositions prior to filing the action. Finally, they contend that they cannot have infringed copyrights of which they are the legal owners. Princess Cruises has filed a companion motion, adopting the bulk of the arguments raised by Fox and CBN.

Warren maintains that he is the beneficial owner of the copyrights, or alternatively that ownership should be returned to him because Fox and MTM have breached agreements to pay him royalties. Warren also asserts that he was not required to register the copyrights before pursuing an infringement claim.

## I. FACTUAL BACKGROUND

The complaint alleges the following:

On or about February 1, 1983, Warren and Triplet executed the first of a series of written contracts with MTM regarding the composition of music for the television series "Remington Steele."[2] The contract

---

**1.** Warren was the sole shareholder, officer and employee of co-plaintiffs Triplet Music Enterprises, Inc. ("Triplet") and Mini–Persons, Inc. ("Mini–Persons"), and is the sole shareholder, officer and employee of co-plaintiff Forerunner Industries, Inc. ("Forerun-

ner"). (First Amended Complaint, ¶¶ 5–7.) Plaintiffs will be referred to generally throughout this order as "Warren."

**2.** Plaintiff's First Amended Complaint ("Pl.'s Complaint"), ¶¶ 16.

provided that MTM would account for sales of broadcast rights to the series to third parties that were affiliated with either ASCAP or BMI.[3] It further provided that when MTM sold broadcast rights to the series to third parties not affiliated with ASCAP or BMI, it would allocate a portion of the sales price to the sale of music and pay Warren fifty percent of that sum.[4] Accounting for all sales was to be in writing.[5] Warren alleges that, pursuant to the contract, he transferred approximately 1,914 original musical works to MTM that were used in the "Remington Steele" series.[6] Fox is the successor-in-interest to MTM.[7]

Warren alleges that MTM and Fox have materially breached their obligations under MTM's contracts with him by failing to account for sales of the broadcast rights to "Remington Steele" to third parties not affiliated with ASCAP and BMI, and by failing to pay 50% of the monies received from these sales for music to Warren.[8] Warren also asserts that MTM and Fox have infringed his copyrights in the musical works used in the series by continuing to broadcast the series, and license it for broadcast, after materially breaching the contracts.[9]

Warren contends that CBN infringed his copyrights in the musical compositions by broadcasting "Remington Steele" on the Family Channel, a cable network owned and operated by CBN. He alleges that, at the time of the broadcasts, the Family Channel was not affiliated with

ASCAP or BMI, and that he has not received royalties in connection with the broadcasts.[10] Warren finally alleges that, in or about 1998 or 1999, MTM or Fox sold one or more episodes of "Remington Steele" to Princess Cruises, which broadcast the shows over its on-board television system.[11] He asserts that Princess Cruises was similarly not affiliated with ASCAP or BMI, and that he received no royalties for its broadcasts.[12]

## II. DISCUSSION

### A. Legal Standard Governing Motions To Dismiss Under Rule 12(b)(1)

The party mounting a Rule 12(b)(1) challenge to the court's jurisdiction may do so either on the face of the pleadings or by presenting extrinsic evidence for the court's consideration. See *White v. Lee,* 227 F.3d 1214, 1242 (9th Cir.2000) ("Rule 12(b)(1) jurisdictional attacks can be either facial or factual"); *Thornhill Publishing Co. v. General Tel. & Electronics,* 594 F.2d 730, 733 (9th Cir.1979) (facial attack); *Meliezer v. Resolution Trust Co.,* 952 F.2d 879, 881 (5th Cir.1992) (challenge based on extrinsic evidence). It is the plaintiff who bears the burden of demonstrating that the court has subject matter jurisdiction to hear the action. See *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Stock West, Inc. v. Confederated Tribes,* 873 F.2d 1221, 1225 (9th Cir.1989).

**3.** *Id.,* ¶ 16(a). ASCAP is the American Society of Composers, Authors and Publishers; BMI is Broadcast Music Incorporated. ASCAP and BMI collect and remit performance royalties for artists and producers who are their members. (*Id.*)

**4.** *Id.,* ¶ 16(b).

**5.** *Id.,* ¶ 16(c).

**6.** *Id.,* ¶ 19.

**7.** *Id.,* ¶ 10.

**8.** *Id.,* ¶ 20.

**9.** *Id.,* ¶ 21.

**10.** *Id.,* ¶ 22.

**11.** *Id.,* ¶¶ 23–24.

**12.** *Id.,* ¶ 24.

There is an important difference between Rule 12(b)(1) motions attacking the complaint on its face and those relying on extrinsic evidence. In ruling on the former, courts must accept the allegations of the complaint as true. See *Valdez v. United States*, 837 F.Supp. 1065, 1067 (E.D.Cal. 1993), aff'd., 56 F.3d 1177 (9th Cir.1995). In deciding the latter, courts may weigh the evidence presented, and determine the facts in order to evaluate whether they have the power to hear the case. See *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir.1987). The "court may not[, however,] resolve genuinely disputed facts where 'the question of jurisdiction is dependent on the resolution of factual issues going to the merits.'" *Id.* (quoting *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.1983)). See also *Careau Group v. United Farm Workers*, 940 F.2d 1291, 1293 (9th Cir.1991) ("where jurisdiction is so intertwined with the merits that its resolution depends on the resolution of the merits, 'the trial court should employ the standard applicable to a motion for summary judgment'"); *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir.1987) ("A district court may hear evidence and make findings of fact necessary to rule on the subject matter jurisdiction question prior to trial, if the jurisdictional facts are not intertwined with the merits") Where jurisdiction is intertwined with merits, "the district court [must] assume[ ] the truth of the allegations in a complaint ... unless controverted by undisputed facts in the record." *Roberts, supra*, 812 F.2d at 1177. See also *Islands, Inc. v. United States Bureau of Reclamation*, 64 F.Supp.2d 966, 968 (E.D.Cal.1999), vacated on other grounds, 2001 WL 503478 (9th Cir. May 11, 2001) ("A court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case"); *Laurence v. United States*, 1993 WL 266657, * 2 (N.D.Cal. July 8, 1993) (same).

## B. Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. Rule 12(b)(6) must be read in conjunction with Rule 8(a) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1356 (1990).

A court may not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Johnson v. Knowles*, 113 F.3d 1114, 1117 (9th Cir.1997); *Moore v. City of Costa Mesa*, 886 F.2d 260, 262 (9th Cir.1989) (quoting *Conley* ), cert. denied, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990). In other words, a Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988).

As noted above, in deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court's review is limited to the contents of the complaint. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir.1996); *Allarcom Pay Television, Ltd. v. General Instrument Corp.*, 69 F.3d 381, 385 (9th Cir.1995). The court must accept all factual allegations pleaded in the complaint as true, and must construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.*,

80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens,* 57 F.3d 747, 750 (9th Cir.1995). It need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981), cert. denied, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981).

Because Rule 12(b)(6) review is confined to the complaint, the court may not consider material outside the pleading (e.g., facts presented in briefs, affidavits, or discovery materials). *In re American Continental Corp./Lincoln Savings & Loan Securities Litigation,* 102 F.3d 1524, 1537 (9th Cir. 1996). It may, however, properly consider exhibits submitted with the complaint, documents whose contents are alleged or relied on in the complaint when their authenticity is not questioned, and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *Lee v. City of Los Angeles,* 250 F.3d 668, 688–89 (9th Cir.2001).[13] The court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing Inc.,* 143 F.3d 1293, 1295 (9th Cir.1998).

## C. Defendants' Request For Judicial Notice and Consideration of Exhibits

### 1. Copyright Certificates

Defendants request that the court take judicial notice of various Certificates of Copyright Registration issued by the United States Copyright Office to MTM Productions between 1984 and 1987. Each registration concerns an episode of "Remington Steele." Under the Federal Rules of Evidence, courts may take judicial notice of facts that are not subject to reasonable dispute, either because they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." FED. R. EVID. 201.

██ Copyright certificates are the type of documents that the court may judicially notice under Rule 201(b)(2). See, e.g., *Oroamerica Inc. v. D & W Jewelry Co., Inc.,* 2001 WL 537780, * 1, n. 4 (9th Cir. May 14, 2001) (Unpub.Disp.) (granting a request that the court take judicial notice of a supplemental copyright registration certificate); *Metro Publishing, Ltd. v. San Jose Mercury News,* 987 F.2d 637 (9th Cir.1993) (taking judicial notice of trademarks registrations issued by the United States Patent and Trademark Office); *Vigil v. Walt Disney Co.,* 1995 WL 621832, * 1–2 (N.D.Cal. Oct.16, 1995) (taking judicial notice of copyright registration certificates).

Because they are properly the subject of judicial notice, the copyright registration certificates submitted by defendants may be considered by the court in addressing both defendants' lack of subject matter jurisdiction arguments under Rule 12(b)(1) and their motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6).

### 2. Contracts

Defendants have also proffered copies of four contracts between MTM and Warren and Triplet.[14] Warren objects to consideration of these documents, asserting that they are not referenced in the complaint,

**13.** Taking judicial notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment. *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986).

**14.** Declaration of Glen Perry in Support of Defendant's Motion to Dismiss ("Perry Decl."), Ex. A–D.

and are not the proper subject of judicial notice.

### a. Consideration Under Rule 12(b)(1)

■ As noted earlier, a district court may consider extrinsic evidence when deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). *White, supra,* 227 F.3d at 1242; *Farr v. United States,* 990 F.2d 451 (9th Cir.1993) ("... the United States did also bring a motion pursuant to Rule 12(b)(1), and it is proper for the district court to consider evidence outside of the pleadings for the purpose of deciding a jurisdictional issue"); *McCarthy v. United States,* 850 F.2d 558, 560 (9th Cir.1988) ("... when considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction"), cert. denied, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989).

Defendants argue that Warren lacks standing to assert a copyright infringement claim because he is neither the legal nor beneficial owner of copyrights in the music he composed for "Remington Steele." See 17 U.S.C. § 501(b) ("The legal or beneficial owner of an exclusive right under a copyright is entitled ... to institute an action for any infringement of that particular right committed while her or she is the owner of it"). Standing is a jurisdictional requirement, and the court must dismiss an action for lack of subject matter jurisdiction if it determines that plaintiff lacks standing to assert a claim. See, e.g., *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines,'" quoting *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct.

3315, 82 L.Ed.2d 556 (1984)); *Rifkin v. Bear Stearns & Co., Inc.,* 248 F.3d 628, 634 (7th Cir.2001) ("Since we have concluded that the lack of standing over the Advisers Act claim was jurisdictional in nature, the district court also had no subject matter jurisdiction over the Article XX claim"); *Penobscot Air Services, Ltd. v. Federal Aviation Administration,* 164 F.3d 713 (1st Cir.1999) ("... Article III's standing requirements are jurisdictional").

The contracts proffered by defendants are relevant in assessing whether Warren is a legal or beneficial owner of the copyrights at issue. For this reason, so long as they do not raise factual issues going to the merits of the case, they are properly considered in deciding defendants' Rule 12(b)(1) motion. *Roberts, supra,* 812 F.2d at 1177. See also *Islands, supra,* 64 F.Supp.2d at 968 (where "resolution of the jurisdictional question is intertwined with the merits of the case," the court must apply the standards used to assess motions to dismiss under Rule 12(b)(6) or motions for summary judgment under Rule 56).

Warren does not dispute that the documents submitted by defendants constitute his contracts with MTM. Rather, he disputes their meaning and their enforceability. The proper interpretation of a contract is a matter of law for the court to decide. *Mendler v. Winterland Production, Ltd.,* 207 F.3d 1119, 1121 (9th Cir. 2000) ("Contract interpretation is a question of law we review de novo"); *Confederated Tribes of Siletz Indians v. Oregon,* 143 F.3d 481, 484 (9th Cir.1998) ("The interpretation and meaning of contract provisions are questions of law reviewed de novo"). While Warren could have proffered extrinsic evidence supporting his interpretation of the contract, which might, in turn, have created genuine issues of fact, he did not do so. Rather, he argues the meaning of the contracts as a matter of

law. Similarly, whether Warren is entitled to reclaim copyright ownership if defendants materially breached the contracts is a question of law.[15] Consequently, the agreements raise no factual issues going to the merits of the case, and the court may properly consider them under Rule 12(b)(1).

### b. Consideration Under Rule 12(b)(6)

■ Even were this not the case, the court could consider the documents in ruling on defendants' motion to dismiss for failure to state a claim upon which relief can be granted. In ruling on a Rule 12(b)(6) motion, the court may consider documents that are referenced in the complaint, or on which the complaint necessarily relies, so long as the authenticity of the documents is not challenged. *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir.1998) ("A district court ruling on a motion to dismiss may consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.' ... Although we have yet to apply this rule to documents crucial to the plaintiff's claims, but not explicitly incorporated in his complaint, such an extension is supported by the policy concern underlying the rule: Preventing plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based... We therefore hold that a district court ruling on a motion to

dismiss may consider a document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies"). See also *Southwest Pet Products, Inc. v. Koch Indus., Inc.*, 89 F.Supp.2d 1115, 1119, n. 2 (D.Ariz.2000) ("[T]he Ninth Circuit made clear that a district court can consider the terms of a contract which is the subject of a dispute even if it has not been attached to the complaint").

In his first amended complaint, Warren references a series of contracts he signed with MTM, and describes in some detail their terms and legal effect.[16] He bases his claims, in large measure, on defendants' alleged breach of these agreements. While he does not quote directly from the exhibits proffered by defendants, Warren's complaint necessarily relies upon the agreements. Moreover, he does not challenge the authenticity of the exhibits defendants have submitted.[17] In fact, Warren himself relies on the contents of the exhibits in opposing the motion to dismiss.[18] Under *Southwest Pet Products*, therefore, the contracts are properly considered under Rule 12(b)(6) as well.

### D. Standing To Assert Copyright Claims

As noted, defendants argue that Warren and his co-plaintiffs lack standing to assert sue for copyright infringement because they are neither the legal nor beneficial owners of copyrights in the music Warren

---

**15.** Whether defendants have breached the agreements undoubtedly raises factual issues. Warren's right to reclaim the copyrights if such breaches are proved, however, is a legal question.

**16.** Pl.'s Complaint, ¶ 16.

**17.** Defendants have adduced the declaration of Glen Perry, Director–Counsel, Rights Administration, for MTM's parent, Fox Family Worldwide, Inc. Perry states that the exhibits

are true and accurate copies of agreements between MTM, Warren and Triplet regarding the provision of Warren's services in connection with the production of "Remington Steele." He further states that the agreements have been maintained by MTM/Fox in the regular course of business. (Perry Decl., ¶¶ 2–5.)

**18.** Plaintiff's Opposition to Defendant's Motion to Dismiss ("Pl.'s Opp.") at 14:23–15:4.

composed for "Remington Steele." Defendants maintain that Warren produced the compositions for which copyrights were obtained under a "work for hire" contract, and contend that such an agreement does not vest beneficial ownership rights in the composer. Warren denies that he wrote the compositions as works for hire, and argues that even if he did, this does not preclude his assertion of beneficial ownership rights.

### 1. The Compositions Were Works For Hire

Under the Copyright Act of 1976, copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). If, however, the work is made for hire, "the employer or other person for whom the work was prepared is considered the author," and owns the copyright absent a written agreement to the contrary. 17 U.S.C. § 201(b). Section 101 of the 1976 Act defines a work for hire as:

"(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire...." 17 U.S.C. § 101.

"The two parts of this working definition are mutually exclusive: the first part applies to works created by employees; the second applies to works created by independent contractors." *Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872, 877 (5th Cir.1997) (citing *Community For Creative Non–Violence v. Reid*, 490 U.S. 730, 742–43, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)).

■ Defendants argue that three types of evidence support their argument that the compositions in question were works for hire. First, they assert that Warren admitted in his original complaint that his copyright in the compositions was "instantly assigned" to MTM, both under the "work for hire" provisions of the contracts and "by actual assignment."[19] Second, defendants contend the copyright registration certificates reflect that MTM is the legal copyright owner. Each registration certificate characterizes the episode of "Remington Steele" being copyrighted as a work for hire.[20] Finally, defendants assert that the MTM/Warren–Triplet contracts demonstrate Warren's work for hire status.

■ As for the allegation in Warren's original complaint that his compositions were "instantly assigned" to MTM as works for hire, Warren contends he intended to state that "DEFENDANTS CONTENDED that the works were 'made for hire' or were transferred by 'assignment.'"[21] "Where a pleading is amended or withdrawn, the superseded portion

---

**19.** Plaintiff's Original Complaint, ¶ 48.

**20.** The copyrights in question protect individual episodes of the "Remington Steele" television series. "All copyrightable elements that are otherwise recognizable as self-contained works, that are included in a single unit of publication, and in which the copyright claimant is the same" are considered a single work for registration purposes. 37 C.F.R.

§ 202.3(b)(3)(i). Consequently, registration of a motion picture (or television show) serves to register the musical compositions contained on the soundtrack of the film or show. *Greenwich Film Productions, S.A., v. DRG Records, Inc.*, 833 F.Supp. 248, 251–52 (S.D.N.Y.1993).

**21.** Pl.'s Opp., declaration of Richard Warren, ¶ 3.

ceases to be a conclusive judicial admission...." *Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir.1996) (quoting *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d 195, 198 (2d Cir. 1929)). Allegations in prior pleadings are competent, admissible evidence of the facts stated, but may be controverted "like any other extrajudicial admission made by a party or his agent." *Rogers v. First Oakbrook Corp. Syndicate*, 1996 WL 329635, * 5 (N.D.Cal. June 6, 1996). See also *Huey, supra*, 82 F.3d at 333 (same). Warren's admission is thus not conclusive evidence that the compositions were works for hire, and does not afford grounds for dismissal.

■ The copyright registration certificates, by contrast, give rise to a presumption that MTM owns the copyrights. *Micro Star v. Formgen, Inc.*, 154 F.3d 1107, 1109–10 (9th Cir.1998). Under § 410(c) of the 1976 Copyright Act, "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). This presumption may be rebutted by appropriate evidence. See, e.g., *Mid America Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir.1995) (under § 410(c), there is "simply a rebuttable presumption and ... 'the burden of proof in the sense of the risk of nonpersuasion ... remains throughout the trial upon the party on whom it was originally cast' "); *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085–86 (9th Cir.1989) (citing *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir.1980), for the proposition that:section 410(c) "raises a rebuttable presumption shifting burden of coming forward with evidence to defendant"); *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908–09 (2d Cir.1980) ("It is clear, however, that a certificate of registration creates no irrebuttable presumption of copyright validity. Where

other evidence in the record casts doubt on the question, validity will not be assumed"); *Creeks U.S.A. Corp. v. Roger Gimbel Accessories*, 1989 WL 168063, * 2 (C.D.Cal. Nov.14, 1989) ("Registration of a copyright does not create an irrebuttable presumption of validity"). See also *Ets–Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1075 (9th Cir.2000) ("Under the copyright laws, Ets–Hokin's certificate of registration from the U.S. Copyright Office entitled him to a 'rebuttable presumption of originality' with respect to the photographs at issue").

Here, each of the registration certificates proffered by defendants reflects an affirmative answer to the question whether the work being copyrighted "[w]as ... a 'work for hire.' " Warren concedes that this constitutes *prima facie* evidence of the nature of the parties' relationship, but asserts that the representations contained in the certificates were contrary to his understanding of the parties' agreements, and even if initially accurate, ceased to be so once MTM/Fox materially breached the contracts. Resolving these issues would that the court decide disputed factual issues going to the merits of the dispute. As this cannot be done in the context of a motion to dismiss challenging subject matter jurisdiction, the certificates, standing alone, do not warrant dismissal of the case.

■ There remain the MTM/Warren-Triplet contracts. Warren asserts that the agreements fail to demonstrate that he was either an employee of MTM, or that MTM "specially ordered or commissioned" the works at issue. Consequently, he contends, the "Remington Steele" compositions could not have been works for hire. Defendants admit that Warren was not an MTM employee, but assert he was an independent contractor with whom MTM. contracted to create works for hire.

The agreements reflect that Triplet Music was the independent contractor with which MTM contracted and that Warren was Triplet's sole employee. The first contract memorializes Triplet's undertaking to "furnish[ ] the services of Richard Lewis Warren ('Artist') for the television pilot entitled 'Remington Steele,' upon the terms and conditions contained herein and in the Music Employment Agreement."[22] Triplet "represent[ed] and warrant[ed] (i) that [it was] an independent Contractor ..., (iii) and that Artist [was] now, and [would] remain during the term of [the Employment Agreement], [its] employee."[23] It further agreed that MTM would "own all right, title and interest in and to Artist's services and the results and proceeds thereof, and all other rights granted to [it] in [the Music Employment Agreement attached as] Exhibit 'A' to the same extent as if Artist had executed Exhibit 'A' and [MTM was] the employer of Artist."[24] The Music Employment Agreement, in turn, provided:

"As Artist's employer for hire, Producer shall own in perpetuity, throughout the universe, solely and exclusively, all rights of every kind and character, in the musical material and all other results and proceeds of the services rendered by Artist hereunder and Producer shall be deemed the author thereof for all purposes. Producer shall have the right to obtain copyright and renewals

of copyright in the musical material in the name of Producer or in Producer's nominee in all countries and to exercise all rights and remedies thereunder...."[25]

Warren, acting for Triplet, signed the agreement, and a separate letter in which he represented that Triplet "[was], and [would] remain, at all times during the term of the Agreements, authorized to furnish [his] services ... as therein provided." Warren's letter stated that "[i]f for any reason [his] employment contract with [Triplet] should expire or be terminated prior to the completion of [his] services [under the contract], [he would] comply with all of the provisions of the agreement as though [he] were a party thereto in place of [Triplet]."[26] The parties executed similar contracts on June 14, 1984, July 25, 1985, and November 17, 1986.[27] If anything, the subsequent agreements are more explicit in defining a "work for hire" relationship.[28]

The parties agree that Warren was not MTM's employee. Defendants, however, assert that he created the works as an independent contractor, and thus that subsection (2) of the work for hire definition applies.[29] There appears to be no question that musical compositions created for inclusion in an audiovisual work such as a television series are one of the categories of "specially ordered or commissioned"

---

**22.** Perry Decl., Ex. A.

**23.** *Id.*

**24.** *Id.*

**25.** *Id.,* Musical Employment Agreement, ¶ 14a.

**26.** *Id.*

**27.** Perry Decl., Ex. B–C.

**28.** See, e.g., *id.,* Ex. B ("It is understood and agreed that [Triplet is] supplying [Warren's] services to [MTM] as [MTM's] employee for

hire in accordance with the provisions of [the Music Employment] Agreement. [MTM] shall own all right, title and interest in and to Artist's services and the results and proceeds thereof, as works made for hire, and all other rights which are granted to [it] in [the Music Employment] Agreement to the same extent as if Artist had executed [the] Agreement"); *id.,* Ex. C (same); *id.,* Ex. D (same).

**29.** See Defs.' Mot. at 6, n. 5.

works that can be accorded work for hire status. See 17 U.S.C. § 101 ("a work specially ordered or commissioned ... as a part of a motion picture or other audiovisual work"). See also *Lulirama, supra,* 128 F.3d at 878 (holding that "audiovisual works" must have a visual component and thus that jingles created for radio advertisements could not be specially commissioned works). There also appears to be no question that Triplet was an independent contractor, as the agreements contain specific provisions to this effect.

Warren argues first that § 101(2) does not apply, because the agreements do not specifically state that the compositions are works for hire.[30] To the contrary, each of Exhibits B through D state specifically that MTM "shall own all right, title and interest in and to Artist's services and the results and proceeds thereof, as works made for hire," while Exhibit A states that MTM will "own all right, title and interest in and to [Warren's] services and the results and proceeds thereof ... to the same extent as if ... [MTM] were the employer for hire of [Warren]." It further incorporates the provisions of the Music Employment Agreement, which states that as Warren's "employer for hire," MTM will have "the right to obtain copyright and renewals of copyright in the musical material" produced pursuant to the contract. These provisions constitute "express[ ] agree[ments] in a written instrument ... that the work shall be considered a work made for hire...."

Warren seeks to overcome this clear language by arguing that the agreements are titled "Music Employment Agreements" rather than "Work for Hire Agreements"; that they state the works are being "assigned" to MTM; that they do not provide that "each work" shall be deemed a work for hire; that they do not state that MTM "specially ordered or commissioned" the compositions; and that he created nearly 2,000 works pursuant to these agreements, a volume inconsistent with the notion of specially commissioned work. The Copyright Act does not require that written contracts memorializing a work for hire arrangement contain the words "specially commissioned or ordered," just as it does not mandate that the phrase "the work shall be considered a work made for hire" appear. Similarly, there is no requirement that the contract state that "each work" composed will be considered a work for hire, or that the agreement be titled a "work for hire contract" rather than something else.[31] Cf. *Playboy Enterprises v. Dumas,* 53 F.3d 549, 560 (2d Cir.1995) (holding that the writing requirement of § 101(2) was satisfied by placing a legend on a check that read: "BY ENDORSEMENT, PAYEE: acknowledges payment in full for the services rendered on a work-made-for-hire basis in connection with the Work named on the face of the this check and confirms ownership by Playboy Enterprises, Inc. of all right, title, and interest (except physical possession), including all right of copyright, in and to the Work"), cert. denied, 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 491 (1995); *Armento v. Laser Image, Inc.,* 950 F.Supp. 719, 730 (W.D.N.C.1996) ("The issue this Court faces is whether that disposition of rights should be ignored because the contract language omits the words 'work for hire.' The Second Circuit [in *Dumas* ] ... indicated that the omission is fatal.... The decision does not articulate why the words 'work for hire' need be included to satisfy the § 101(2)

---

**30.** Pls.' Opp. at 17:6–9.

**31.** In fact, the actual agreements between MTM and Triplet are untitled, and simply incorporate the provisions of a form "Music Employment Agreement" attached as Exhibit A.

writing requirement but instead simply cites to the statute. The statute, however, does not demand such a parsimonious reading. Moreover, as the present case indicates, rotely invalidating the ownership effect of [a] work for hire contract because it fails to include the words 'for hire' leads to unjust results and undermines the purposes of the Copyright Act").

Finally, the number of works composed during the life of the various contracts does not undercut the clear import of the language used. Rather, it is consistent with the nature of the audiovisual work in which the compositions were to be incorporated—a weekly television show, by definition, requires the production of substantial quantities of verbal, visual and musical content. Warren was hired to compose, arrange, conduct and produce music for the "Remington Steele" series.[32] His work was keyed to specific episodes of the series, as Triplet was to be "paid $3,000 per episode payable upon completion of all services required hereunder for each episode." [33] Moreover, the producers of "Remington Steele" had creative control of Warren's work,[34] and the exclusive right to his services.[35] The agreements clearly created a classic work for hire relationship.[36]

Warren next asserts that his compositions cannot be considered works for hire because the agreements provide that he and Triplet will be compensated through the payment of royalties. In *Dumas, supra,* the Second Circuit interpreted, *inter alia,* the work for hire provisions of the

1909 Copyright Act. *Id.* at 553–57. In the course of applying the "instance and expense" test used to determine if a work had been made for hire under that Act, the court noted that the payment of royalties to the creator—as opposed to a sum certain—"generally weighs against finding a work-for-hire relationship." *Id.* at 555. Although the court later concluded that the 1976 Act's "specially ordered and commissioned" language in effect incorporated the "instance and expense" test (*id.* at 562), it is clear from the court's opinion and from other cases that the form of compensation was not determinative under the 1909 Act, and cannot be under the 1976 Act as well. See *Dumas, supra,* 53 F.3d at 555 (citing *Picture Music, Inc. v. Bourne, Inc.,* 457 F.2d 1213, 1216 (2d Cir.), cert. denied, 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972), for the proposition that "the absence of a fixed salary ... is never conclusive"); *Picture Music, supra,* 457 F.2d at 1216 ("The Court in *Donaldson [Publishing Co. v. Bregman, Vocco & Conn, Inc.,* 375 F.2d 639, 643 (2d Cir.1967), cert. denied, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968) ], listed as among the factors that show that there was no employment for hire, the absence of a fixed salary and the author's 'freedom to engage in profitable outside activities without sharing the proceeds with' the alleged employer.... The absence of a fixed salary, however, is never conclusive ... nor is the freedom to do other work, especially in an independent contractor situation"); *Murray v. Gelderman,* 566 F.2d 1307, 1310, n. 7 (5th Cir.1978) ("The compensation

---

**32.** Perry Decl., Exs. A–D, Music Employment Agreements, ¶ 2.

**33.** *Id.,* Exs. B–D, ¶ 1(c).

**34.** *Id.,* Exs. A–D, ¶ 1 ("Producer's judgment shall be final in all matters, including matters involving artistic and creative matters").

**35.** *Id.,* Exs. A–D, ¶ 8.

**36.** Warren also asserts that the contracts "assign" the musical compositions to MTM. (Pls.' Opp. at 17:4–7.) He provides no citation to specific provisions of the agreements to support this claim, however. The court has reviewed the contracts, and finds no provision regarding "assignment" of the compositions or copyrights in them.

scheme is clearly collateral. We are not concerned with whether Murray was entitled to a share of the profits or to a precise sum, for neither the form of compensation, nor the amount, is determinative," citing *Picture Music* ). In the instant case, the unambiguous terms of the contracts establish that Triplet and Warren had a work for hire relationship with MTM.[37]

■ Because the contract language clearly establishes that Warren's compositions were commissioned works for hire, plaintiffs' allegations to the contrary are unavailing. Under Rule 12(b)(1), the court need not accept those allegations as true. See *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.1983) (in deciding a Rule 12(b)(1) motion, "[n]o presumptive truthfulness attaches to plaintiff's allegations . . .," quoting *Thornhill Publishing Co., supra,* 594 F.2d at 733). Indeed, even in the context of a Rule 12(b)(6) motion, the court need not accept allegations that are legal conclusions when they are unsupported by the facts. See *Steckman, supra,* 143 F.3d at 1295 (the court need not accept as true allegations that are contradicted by documents referenced in the complaint); *Western Mining Council, supra,* 643 F.2d at 624 (in ruling on a Rule 12(b)(6) motion, the court need not accept as true allegations are that nothing more than bare legal conclusions).[38] On the basis of the unam-

37. Warren asserts that he did not intend to create such a relationship. (Pls.' Opp. at 18:7–8.) While his intent would be relevant if the language of the contracts were ambiguous, and if certain contractual terms were reasonably susceptible of an interpretation consistent with his purported intent, such is the not case here. Warren's citation of *Hi-Tech Video Productions, Inc. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093, 1097–98 (6th Cir.1995), is to no avail, as there the Sixth Circuit looked to the parties' intent to determine whether an artist was an employee or an independent contractor. Such perceptions are cited in the Restatement of Agency as relevant to a worker's employment status, and the Supreme Court in *Reid* directed that such factors be consulted. *Id.* at 1097 (citing *Reid, supra,* 490 U.S. at 752, n. 31, 109 S.Ct. 2166 ("In determining whether a hired party is an employee under the general common law of agency, we have traditionally looked for guidance to the Restatement of Agency")). Here, there is no doubt that Triplet (and thus Warren) were independent contractors.

38. Warren contends the work for hire doctrine is unconstitutional. Courts that have considered the question have upheld its constitutionality. See, e.g. *Childress v. Taylor,* 945 F.2d 500, 506, n. 5 (2d Cir.1991) ("Though the United States is perhaps the only country that confers 'authorship' status on the employer of the creator or a work made for hire . . ., its decision to do so is not constitutionally suspect"). As respects "specially commissioned" works, which is the as-

pect of the doctrine at issue in this case, the requirement that parties expressly agree in a written contract that the work is one for hire removes any constitutional issue that might exist. See P. Heald and S. Sherry, Implied Limits on the Legislative Power: The Intellectual Property Clause as an Absolute Constraint on Congress, 2000 U. ILL. L. REV. 1119, 1190 (2000) (speaking of § 101(1), the authors state: "Before the enactment of the 1976 work-for-hire statute, courts recognized . . . the enforceability of employment contracts that assign the ownership of copyrighted works produced by an employee in the course of his or her employment to his or her employer. The work-for-hire statute has the same effect as prior private contractual provisions vesting copyright ownership in the employer, except that it saves the employer from having to add express contract language regarding transfer of copyright ownership. The question of ownership is still open to negotiation, although the negotiating edge may be shifted to the employer. This change in the power dynamics of employer-employee relations does not rise to the level of a suspect grant of exclusive rights to the employer"); D. Nimmer, Copyright Ownership by the Marital Community: Evaluating Worth, 36 UCLA L. REV. 383, 405–06 (1988) ("the work-for-hire provision embodied in Section 201(b) can be reconciled with constitutional limits, inasmuch as its further provision allows the parties to agree 'otherwise' as to who 'owns all rights comprised in the copyright.' This latter provision saves works for hire from

biguous contract documents, therefore, the court concludes that Warren's compositions were works for hire commissioned by MTM.

### 2. The Creator Of A Work For Hire Cannot Claim Beneficial Ownership Of A Copyright In The Work

Section 201(b) of the 1976 Copyright Act provides:

"In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author ..., and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all the rights in the copyright." 17 U.S.C. § 201(b).

■■■■ Warren has not alleged that any written instrument reserves or transfers rights in the "Remington Steele" compositions to him. Instead, he asserts that he has a contract right to receive royalties based on his contribution to the series. In the absence of an express grant of rights, as required by the plain language of the statute, the creator of a work for hire cannot assert a beneficial interest in the copyright protecting the work. See *Moran v. London Records, Ltd.*, 827 F.2d 180, 183–84 (7th Cir.1987) ("[Plaintiff] could have secured an interest in the copyright by expressly agreeing with [defendant] that he would own the copyright or an exclusive right under the copyright. He did not, and we will not allow [plaintiff] into federal court under his claim of beneficial ownership when Congress has precluded entry by § 201(b)'s work made for hire provision"). See also *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d

1486, 1490 (11th Cir.1990) (allowing the defendant in a copyright infringement suit to assert that the plaintiff-employee was not the copyright owner under the work for hire doctrine and thus lacked standing to sue).

The Seventh Circuit in *Moran* examined the legislative history of the 1976 Act and determined that Congress did not intend "to expand the concept of beneficial ownership beyond that found in the prior case law." *Id.* at 183. It observed:

"The legislative history states that 'a "beneficial owner" ... would include, for example, an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees.' H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 159, reprinted in 1976 U.S.Code Cong. & Ad.News 5659, 5775. Although the legislative history does not purport to exhaustively list who may be a beneficial owner, it is significant that the example Congress did give was that of an author who assigned his work in exchange for royalties—the classic example of a beneficial owner in the cases deciding standing to sue under the 1909 Act. Given that no case has held an employee in a work made for hire situation to be a beneficial owner, and that Congress merely intended to codify the existing case law, see *Cortner [v. Israel,* 732 F.2d 267, 271 (2d Cir. 1984)]*, the fact that Congress did give only the assignment example supports the conclusion that Congress did not intend to extend the concept of beneficial ownership to include an employee in a work made for hire arrangement." *Id.*

importing an automatic congressional divestment of author status, which would be arguably unconstitutional. Rather, the statute simply embodies the more familiar example of an assignment of rights (albeit implied) from author to another party—in this case the

author's employer which implied assignment manifestly cannot be held to exist in the fact of an express agreement to the contrary. The work-for-hire doctrine passes muster, in sum, based on the implicit consent of the author whose rights the Constitution protects").

This holding is consistent with the notion that " 'an author who ha[s] parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees' " is a beneficial owner of the rights. *Cortner, supra,* 732 F.2d at 271 (quoting H.R.Rep. No. 1476, 94th Cong., 2d Sess. 159, reprinted in 1976 U.S.Code Cong. & Ad.News 5659, 5775). The 1976 Act provides that the employer or commissioning entity is the "author" of a work for hire. 17 U.S.C. § 201(b). Under such a statutory scheme, the composer or creator of the work does not part with title, as title vests immediately in the entity at whose instance the work is created. Thus, no beneficial rights are created.[39]

As Warren is neither the legal nor beneficial owner of copyrights to the compositions he created for "Remington Steele," he has no standing to bring a copyright infringement claim, and defendants' Rule 12(b)(1) motion must be granted.

### 3. Whether Plaintiffs Are Entitled To Reclaim The Copyrights If Defendants Materially Breached The Contracts

■ Warren seeks to forestall this result, arguing that even if he did not initially own copyrights in the musical compositions he created for "Remington Steele," he may reclaim them now because MTM and its successors materially breached their agreements to compensate him for his work. This claim is based on a discus-

sion in Professor Nimmer's treatise regarding the impact of a material breach on ownership of a work for hire. Nimmer states:

"Who may claim copyright in a work made for hire where the hiring party wrongfully refuses to pay the employee or commissioned party for his services or otherwise materially breaches the contract between them? ... [¶][A]n employer may claim to be the copyright proprietor not simply by reason of his status as an employer, but rather by reason of a presumed agreement ... that the employer shall acquire the rights of the author. If ... the employer's claim of copyright is based upon the agreement (albeit implied) of the employee, then surely a material breach by the employer must under traditional principles of contract law entitle the employee to rescind the employment agreement and hence claim back the copyright which he had agreed to convey." 2 M. and D. Nimmer, NIMMER ON COPYRIGHT, § 5.03[E] (2000).

The notion that the creator of a work for hire may reclaim the copyright in his or her work once there has been a material breach of the work for hire agreement by the commissioning party finds limited support in the case law. In *Hughey v. Palographics,* 189 U.S.P.Q. 527 (D.Colo.1976), the court held that the presumption that a work for hire is owned by the employer or commissioning party does not apply where

---

**39.** Warren cites *Cortner* and *Batiste v. Island Records, Inc.,* 179 F.3d 217 (5th Cir.1999), as support for his claim of beneficial ownership. Neither case, however, involved a work for hire relationship. Rather, in each, a party transferred all rights to original music, including the copyrights, to a third party in exchange for royalties. See *Batiste, supra,* 179 F.3d at 219, 220. n. 1 (composers of musical work "transferred th[e] composition, including the title, words, music, and the exclusive right to secure copyright, to Bolden," a music publisher/record producer; the court

held that they could "properly assert their copyright infringement claims as beneficial owners of Bolden's registered copyright"); *Cortner, supra,* 732 F.2d at 269 & n. 1 (composers assigned all rights, including copyrights, in music to their wholly owned company which in turn assigned the rights to the American Broadcasting Company; while noting that ABC "mildly suggests that appellants created the 1976 theme as employees for hire," the court pronounced itself satisfied that the composers were the legal authors of the work).

the contract is abandoned and both parties "regard[ ] the contract to be at an end." *Id.* at 532–33. In *Brown v. Cosby*, 433 F.Supp. 1331 (E.D.Pa.1977), the court suggested in dicta that plaintiff could state a copyright infringement claim by pleading "facts amounting to a material breach" of contract and seeking to rescind. It did not decide the issue, however, as it found that any such claim was barred by the statute of limitations. *Id.* at 1343–44. Finally, in *Black v. Pizza Time Theatres, Inc.*, 1983 WL 1140 (N.D.Cal. Aug.15, 1983), the court held, citing Nimmer, that by alleging a breach of an employment agreement and praying for rescission, an employee stated a claim for ownership of the copyrights under an exception to the work for hire doctrine. *Id.* at * 1.

The weight of authority is to the contrary, however. In *Royal v. Leading Edge Prod., Inc.*, 833 F.2d 1 (1st Cir.1987), for example, an employee sued his employer seeking monies due under an agreement that obligated the employer to pay royalties on sales of a computer software package the employee developed prior to his discharge. The employee argued that the employer's breach of the royalty agreement entitled him to rescind the contract and regain ownership of the copyright in the software. *Id.* at 3. Noting the "dubious provenance" of Nimmer's theory, the First Circuit rejected the employee's argument, holding that "there [was] neither authority nor precedent for the assertion that [the] breach of a *royalty agreement alone* catalyzes an implicit exception to the work-made-for-hire doctrine." *Id.* at 3, 4 (emphasis original). See also *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 586 (9th Cir.1993) ("A breach will justify rescission of a licensing agreement only when it is 'of so material and substantial a nature that

[it] affect[s] the very essence of the contract and serve[s] to defeat the object of the parties.... [The breach must constitute] a total failure in the performance of the contract,'" quoting *Affiliated Hosp. Prod. Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183, 1186 (2d Cir.1975)); *id.* ("'After considerable performance, a slight breach which does not go "to the root" of the contract will not justify termination'"); *Malinowski v. Playboy Enter., Inc.*, 706 F.Supp. 611, 615 (N.D.Ill.1989) ("[T]he case law that has developed since adoption of the Copyright Act very specifically states that nonpayment of royalties do not constitute claims arising out of the Copyright Act").

Nimmer posits that in a work for hire situation, the employer obtains ownership of a copyright in the employee's work as an implied term of the employment agreement. If the employee is wrongly terminated, he or she has no easy remedy and rescission of the implied copyright term may be appropriate. Where, however, there is an express contractual obligation to pay royalties, the remedy for a breach is clear, and the implication of a right to rescind is not necessary. *Royal, supra,* 833 F.2d at 3–4. See also *IXL Inc. v. AdOutlet. Com, Inc.*, 2001 WL 315219, *13 (N.D.Ill.2001) ("[W]e agree with the observation [made by] the Court in *Royal* ... that there is 'scant reason' to imply any condition concerning ownership of a copyright when an 'unambiguous compact occupies the field'"). Here, the parties' contracts specifically provided that money damages would remedy any breach, and that rescission was not an available remedy.[40]

 Finally, unlike the pleading in *Pizza Time Theatres,* Warren's first amended complaint does not seek rescis-

---

**40.** Perry Decl., Ex. A, ¶ 27(b); Ex. B–D, ¶ 28(d) ("Contractor's relief shall be the recovery of money damages and the rights granted by Artist and Contractor hereunder shall not terminate by reason of such breach").

sion of the parties' contracts. See also *Rano, supra*, 987 F.2d at 585 (plaintiff alleged that he had terminated his licensing agreement with defendant). Nor does it indicate a willingness to restore to defendants the benefits Warren has received under the contract to date. See *Resure, Inc. v. Superior Court*, 42 Cal.App.4th 156, 165, 49 Cal.Rptr.2d 354 (1996) (noting that a plaintiff bringing a rescission action must generally give notice in the complaint of his willingness to restore benefits if rescission is granted); *Imperial Casualty & Indemnity Co. v. Sogomonian*, 198 Cal. App.3d 169, 184, 243 Cal.Rptr. 639 (1988) ("The consequence of rescission is not only the termination of further liability, but also the restoration of the parties to their former positions by requiring each to return whatever consideration has been received"). Thus, even were the court to accept Warren's assertion that he is entitled to reclaim the copyrights because a material breach has occurred, his complaint does not plead such a theory.[41]

As Warren is neither the legal nor the beneficial owner of copyrights in the music for "Remington Steele," he does not have standing to maintain a copyright infringement action. Accordingly, defendants' motion to dismiss plaintiffs' infringement claims is granted.[42]

### D. Supplemental Jurisdiction Over The Remaining Claims

With dismissal of the copyright claims for lack of subject matter jurisdiction, the

---

41. At the hearing, Warren's counsel requested that he be given leave to amend the complaint to add a claim for rescission if his client so desired. Rescission is a state law remedy. Because Warren's copyright infringement claim must be dismissed, and because no other federal question is presented, the court would not have jurisdiction to adjudicate such a claim. The mere fact that ownership of a copyright is at issue would not be sufficient to vest the court with jurisdiction. Where a copyright infringement claim turns on questions of copyright ownership, which are in turn dependent on an interpretation of the parties' contract, the court must retain jurisdiction and resolve the contract question. "Only when such ownership is the sole question for consideration are federal courts without jurisdiction." *Topolos v. Caldewey*, 698 F.2d 991, 994 (9th Cir.1983). See also *Firoozye v. Earthlink Network*, 153 F.Supp.2d 1115, 1123 (N.D.Cal.2001). Here, ownership would be the sole question, as no issue of infringement could arise until there was a finding of material breach and copyright ownership reverted to Warren. See *Rano, supra*, 987 F.2d at 586 ("[U]nder federal and state law a material breach of a licensing agreement gives rise to a right of rescission which allows the nonbreaching party to terminate the agreement.... After the agreement is terminated, any *further* distribution would constitute copyright infringement" (emphasis added)). See also *Graham v. James*, 144 F.3d 229, 237–38 (2d Cir.1998). For this reason, the court must decline Warren's request for leave to amend.

42. Defendants maintain that Warren's claims are also defective because he did not register a copyright in the compositions before bringing suit, and because the legal owner of a copyright and its licensees cannot be sued for infringing that copyright. As the court has concluded that Warren lacks standing to bring an infringement claim, and as the court lacks subject matter jurisdiction as a result, it need not reach these issues. The court notes, however, that case law clearly supports defendants' latter argument. See *Cortner, supra*, 732 F.2d at 271 ("It is elementary that the lawful owner of a copyright is incapable of infringing a copyright interest that is owned by him"); *Fantasy, Inc. v. Fogerty*, 654 F.Supp. 1129, 1130–31 (N.D.Cal.1987) (same). While the legal owner of a copyright can sue the beneficial owner for infringement, as the beneficial owner does not possess the entire bundle of ownership rights protected by the copyright and so may exceed his rights, (*id.* at 1131), there is no authority for the proposition that the converse is true. Indeed, even under Warren's rescission theory, there can be no infringement of the copyright until the rescission remedy is complete. See *Rano, supra*, 987 F.2d at 586 ("After the agreement is terminated, any further distribution would constitute copyright infringement").

only claims that remain in the action are state law causes of action for breach of contract, an accounting, conversion, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, and fraud.[43] Defendants assert that the court should decline to exercise jurisdiction over these claims because, with the federal claims dismissed, state law causes of action substantially predominate. It is within a court's discretion to decline to exercise supplemental jurisdiction over state law claims if it has dismissed all federal claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3); *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350, n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Schultz v. Sundberg,* 759 F.2d 714, 718 (9th Cir.1985) ("[g]enerally, dismissal of federal claims before trial dictates that the pendent state claims should also be dismissed"). Such an outcome is appropriate in this case. Because jurisdiction was premised on the existence of federal claims, and because Warren lacks standing to pursue those claims, the court declines to exercise supplemental jurisdiction over the state law contract and tort claims and they are dismissed without prejudice.

### III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss plaintiffs' copyright claims is granted without leave to amend. Plaintiffs' remaining claims are dismissed pursuant to 28 U.S.C. § 1367(c)(3) without prejudice to their refiling in state court.

---

43. While several of the remaining claims seek the payment of contractual royalties on copyrighted materials, "the federal grant of a patent or copyright has not been thought to infuse with any national interest a dispute as to ownership or contractual enforcement turning on the facts or on ordinary principles of contract law." *Dolch v. United California Bank,* 702 F.2d 178, 180 (9th Cir.1983) (quoting *T.B. Harms, Co. v. Eliscu,* 339 F.2d 823, 826 (2d Cir.1964)). See also *Topolos v. Cal-dewey,* 698 F.2d 991, 993 (9th Cir.1983) ("[a] case does not arise under the federal copyright laws ... merely because the subject matter of the action involves or affects a copyright"). "Contract questions that depend on common law or equitable principles belong in state court." Thus, "[t]he federal courts have consistently dismissed complaints in copyright cases that present only questions of contract law...." *Dolch, supra,* 702 F.2d at 180.